UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALL STATES HUMANE GAME FOWL
ORGANIZATION, INC., BRUCE
CLOUGH, and RUTH CLOUGH,

      Plaintiffs,

v.                                    Case No. 3:08-cv-312-J-33MCR

CITY OF JACKSONVILLE, FLORIDA,
JOHN RUTHERFORD IN HIS OFFICIAL
CAPACITY AS SHERIFF OF THE
JACKSONVILLE SHERIFF'S OFFICE,
OFFICER D.A. BISHOP IN HIS
INDIVIDUAL CAPACITY, AND TERESA A.
TERRELL IN HER INDIVIDUAL CAPACITY,

      Defendants.

_____/

## ORDER

This matter comes before the Court pursuant to Plaintiffs'
Motion for Preliminary Injunction (Doc. # 2), which was filed on
March 28, 2008. On April 14, 2008, Defendants filed a response in
opposition to Plaintiffs' Motion for Preliminary Injunction (Doc.
# 10), which Defendants amended on April 16, 2008 (Doc. # 12). On
May 13, 2008, with leave of Court, Plaintiffs filed a reply to
Defendants' amended response (Doc. # 17), and Defendants filed a
sur-reply on June 2, 2008 (Doc. # 22). On July 2, 2008, this Court
held a hearing on Plaintiffs' Motion for Preliminary Injunction
(Doc. # 28). This case involves the destruction of hundreds of
roosters on private property without notice or a hearing. Under

the unique circumstances of this case, partial relief in favor of Plaintiffs is necessary to promote the ends of justice. Thus, after hearing the arguments of counsel and reviewing the affidavits and pertinent case law, the Court grants in part and denies in part Plaintiffs' Motion for a Preliminary Injunction as follows.

I.   **Background**

Plaintiffs, Bruce Clough and Ruth Clough (husband and wife) as well as the All States Humane Game Fowl Organization (hereafter "All States"), allege that the Cloughs and others marched in front of the City of Jacksonville's Division of Animal Care and Control on October 20, 2007, in protest of the killing of roosters owned by Danny Rowland. (Doc. # 26 at ¶¶ 10-11).[1]  On January 15, 2008, (nearly three months after Plaintiffs' October 20, 2008 protest march), Officer Bishop and others from the Jacksonville Sheriff' Office "in full combat gear," along with members of the City's Division of Animal Care and Control, "burst through the door of Mr. and Mrs. Clough's home." (Doc. # 26 at ¶ 12).

It is not contested that the Officers came to the Clough residence on January 15, 2008, pursuant to a search warrant issued by a state court judge. (Doc. # 26 at ¶ 13).  The search warrant

---

[1] According to Plaintiffs' First Amended Complaint, Plaintiff All States organization "is dedicated to the exhibit, health, and beauty of the American game fowl." (Doc. # 26 at ¶ 4).  Further, Plaintiffs Bruce Clough and Ruth Clough are the president and secretary of the All States organization, respectively. (Doc. # 26 at ¶ 5).

was issued following the presentation of an affidavit for search warrant by Defendant Bishop. (Doc. # 12-2 at 13-15).  The record contains both the affidavit for search warrant signed by Officer Bishop and the search warrant signed by a Fourth Judicial Circuit Court Judge.  Officer Bishop's affidavit for search warrant contains a brutal description of cockfighting and alleges that the Cloughs were engaged in the illegal practice. (Doc. # 12-2 at 14).[2]

---

[2] Officer Bishop's affidavit for search warrant describes illegal cockfighting in excruciating detail, but does not allege that he witnessed actual cockfighting at the Clough residence; rather, it appears that Officer Bishop only observed roosters with their combs and wattles excised (a process known as dubbing, which will be discussed later in this opinion):

> Within the past 10 days your affiant went to the above described residence to investigate illegal cock fighting. Your affiant is personally aware of the existence of citizen complaints regarding illegal cockfighting. Upon arriving at the residence your affiant observed numerous roosters in the yard of said premises. Your affiant is familiar with cock fighting and observed roosters in the yard of the residence that had their combs and wattle cut off. The comb and wattle are cut off in order to facilitate the placement of a hood over the birds' heads to keep them calm prior to the beginning of a fight and to decrease the potential for wounds and bleeding in these fleshy areas. The roosters spurs were cut or trimmed on the birds, so they could be equipped with either gaffs or knives tied to the leg in the area where the bird's natural spur has been partially removed. The roosters were also separated on tie cords and in separated cages. This is a technique commonly used to keep roosters separated in order to control fighting. Roosters raised for fighting are tormented to make them aggressive and pumped full of stimulants to increase endurance. Cock fights usually result in the death of one, of not both roosters in a pit. Handlers place two roosters in a pit. The roosters have either gaffs or knives attached to their legs. The roosters then peck and maim one another with their beaks and weapons. Once

The search warrant alleges that the Clough residence was "being used by Bruce D. Clough for the purpose of violating the laws relating to fighting or baiting animals, to wit: baiting, training, transporting, selling, owning, possessing, or using any wild or domestic animal for the purpose of animal fighting or baiting; in violation of Section 828.122(3)(a), Florida Statutes." (Doc. # 12-2 at 11).  The search warrant directed seizure of "the property described in this warrant, to-wit: Fighting or baiting animals, equipment for use in any activity, money wagered on animal fighting or baiting, in violation of Section 828.122, Florida Statutes." (Doc. # 12-2 at 11).[3]

Plaintiffs contend that Ruth Clough showed the Defendant Officers around the premises, and the Officers stared to search the home and surrounding area.  (Doc. # 26 at ¶ 15-16).  Thereafter, Plaintiffs allege that the Officers started killing roosters on Plaintiffs' property that were "dubbed." (Doc. # 26 at ¶ 23).

---

the roosters are placed into a pit to fight, which allows them no opportunity to escape.  Although they have been bred to fight, the animals become tired, incapable, and suffer severe injuries or death.  Upon your affiant['s] observation of the roosters on the premises, your affiant believes that illegal cock fighting and breeding are taking place at the premises to be search[ed].

(Doc. # 12-2 at 13-14).

[3] Plaintiffs assert that the search warrant was "devoid of probable cause to believe any crime was being or was about to be committed." (Doc. # 26 at ¶ 14).

4

According to Plaintiffs, the dubbing of roosters is "a process by which the lobes, wattles, and combs of the bird are clipped with shears, such as surgical scissors." (Doc. # 26 citing a reference regarding poultry dubbing).[4]

Defendant Teresa A. Terrell is a field supervisor with the Animal Care and Control Division of the City of Jacksonville. (Doc. # 26 at ¶ 9). Plaintiffs allege, "Officer Terrell searched the premises for dubbed roosters, believing their only use was for cockfighting." (Doc. # 26 at ¶ 22).   Officer Terrell determined that the roosters could not be "humanely housed" and needed to be euthanized. (Doc. # 26 at ¶ 22). She supervised the killing of the roosters, personally killing approximately 100 roosters herself. (Doc. # 26 at ¶ 22).   Plaintiffs argue that the Officers killed 314 of Plaintiffs' roosters: All but six of the dubbed roosters were killed by plunging a needle into the roosters' chests and injecting them with an unknown substance, and six of the dubbed roosters were let out of their cages and fought with each other until they killed each other. (Doc. # 26 at ¶¶ 23-26).[5]

---

[4] Defendants contend that rooster dubbing has no purpose other than for illegal animal fighting.  The declaration of Teresa Terrell states, "The only use for dubbed roosters is cockfighting." (Doc. # 12-3 at ¶ 8).  Likewise, the declaration of Officer Bishop states, "We found a total of 314 'dubbed' roosters on the premises, which are illegal fighting animals under Florida law." (Doc. # 12-2 at ¶ 5).

[5] It is not contested that the officers left 150 of the non-dubbed roosters alone on the property and did not kill them or otherwise interfere with them. (Doc. # 26 at ¶ 27).

Plaintiffs contend that, during the search of the Cloughs' property, the officers seized: (a) two books on gamecocks; (b) a set of scales and weights; (c) wax twine; (d) a set of index cards bearing the names and addresses of the members of the All States Organization; (e) a copy of Danny Rowland's search warrant; (f) two bottles of over-the-counter antibiotics; (g) one camera; and (h) a set of scrapbooks. (Doc. # 26 at ¶ 28).[6]

Plaintiffs also allege that while the roosters were being killed, Officer Bishop asked Bruce Clough "when he was going to march again?" (Doc. # 26 at ¶ 25). With their roosters killed and the membership information for the All States organization seized, Plaintiffs filed a complaint against the City of Jacksonville, Florida; John L. Rutherford, in his official capacity as Sheriff of the Jacksonville Sheriff's Office; and Officer D.A. Bishop, in his individual capacity on March 28, 2008. (Doc. # 1). Plaintiffs sought leave to amend the complaint, which was granted, and Plaintiffs filed their first amended complaint on June 19, 2008, adding Defendant Teresa A. Terrell, in her individual capacity (Doc. ## 20, 25, 26).

---

[6] It appears that metal spurs or razor blades of some sort were also seized from Bruce Clough, but, Plaintiffs failed to mention this in the First Amended Complaint. (Doc. # 12-2 at ¶ 8(e). During the hearing, counsel for Plaintiffs argued that the "spurs" tendered to Defendants by Bruce Clough were actually blades used to open feed bags.

## II.  __Complaint Counts__

The First Amended Complaint contains five counts.  Count one alleges that the Defendants infringed Plaintiffs' First Amendment right to freedom of speech and petition. (Doc. # 26 at ¶¶ 29-31). Specifically, Plaintiffs allege that Defendants "discouraged" Plaintiffs "from protesting against the Defendants in the future" and that Defendants' conduct constitutes (a) an attempt to regulate and chill the exercise of the First Amendment protected speech; (b) a system of censorship and prior restraint lacking those procedural safeguards necessary to obviate the dangers of a censorship system; and (c) a deprivation of the right to petition government for redress of grievances. (Doc. # 26 at ¶¶ 30-31).

Count two alleges that Defendants violated Plaintiffs' First Amendment right to freedom of association. Specifically, Plaintiffs assert that the seizure of the membership list for the All States organization "increases the likelihood of a substantial restraint upon members' exercise of their right to freedom of association" and that "seizure of the only existing membership list hampers the association and cripples the relationship between the freedom to associate and privacy in one's association." (Doc. # 26 at ¶¶ 32-35).

Count three alleges that Defendants violated the Fourteenth Amendment. Specifically, Plaintiffs assert, "Defendants' seizing and killing 314 of Plaintiffs' show roosters constitutes a

significant taking of property by the State without due process of law and such a taking violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (Doc. # 26 at ¶¶ 36-38).

Count four alleges that Defendants violated the due process clause of the Fourteenth Amendment and that "Defendants deprived Plaintiffs of their property without affording procedural due process, including but not limited to the process set forth in Florida Statute Section 828." (Doc. # 26 at ¶¶ 40-41).

Count five alleges that Defendants violated the Fourth Amendment's bar against unlawful search and seizure. Plaintiffs assert that "the search warrant relied upon by the Defendants was defective and facially invalid due to the Affidavit submitted for its issuance lacking any probable cause to believe any crime was being committed." (Doc. # 26 at ¶ 44). Plaintiffs further assert that "as grounds for probable cause stated in the Affidavit for Search Warrant was the allegation that the roosters were dubbed. The dubbing of roosters is not determinative of whether the rooster is a fighting rooster.  In fact, the American Poultry Association rules require that show fowl be dubbed, which results in rapid feathering, rapid growth, better identification, less fighting, better livability, and better fertility." (Doc. # 26 at ¶ 46).

III. **Defendants' Answer and Affirmative Defenses**

Defendants filed an answer and their affirmative defenses to the original complaint on April 21, 2008 (Doc. # 13), and answered the First Amended Complaint on June 27, 2008 (Doc. # 27). The thrust of the defenses is (1) that qualified immunity shields Officer Bishop and Animal Control Officer Terrell, and (2) that Plaintiffs were engaged in criminal violations of Florida Statute Sections 828.122 and 828.12 at the searched premises on January 15, 2008, and prior thereto, which justified the issuance of the search warrant for the premises and the seizures made at the premises upon its execution. (Doc. # 27 at 9).

IV. **Plaintiffs' Motion for Preliminary Injunction**

Plaintiffs filed the Motion for Preliminary Injunction on March 28, 2008, contemporaneously with the filing of the complaint. (Doc. ## 1, 2). This Court set a preliminary injunction hearing for July 2, 2008. Plaintiffs' motion for Preliminary Injunction repeats the factual allegations of the complaint: mainly that various officers of the Jacksonville Sheriff's office and animal control came on to the Cloughs' private property, seized the membership information for the All States organization and then killed over 300 of the Cloughs' dubbed roosters. Plaintiffs' Motion for Preliminary Injunction seeks a preliminary injunction "enjoining the Defendants, their agents, servants, employees, attorneys, and all person in active and concert participation from

9

(a) further infringing on Plaintiffs' first amendment rights;(b) violating Plaintiffs' First Amendment Right to associate; and (c) taking of property without due process of law." (Doc. # 2 at 4).

During the Preliminary Injunction hearing, Plaintiffs advised the Court that Plaintiffs scaled back the relief requested in their Motion for Preliminary Injunction. Plaintiffs now request an order (1) enjoining the Defendants from killing any more of the Cloughs' birds without giving the Cloughs an opportunity to be heard; (2) enjoining the Defendants from using the seized membership list from the All States organization;[7] and (3) compelling the Defendants to return the membership list of the All States organization to Plaintiffs.

A.  **Warring Affidavits**

In support of the relief Plaintiffs now seek, Plaintiffs have filed the affidavit of Ruth Clough (Doc. # 3), the affidavit of Nicky Huggins (Doc. # 17-3), and the affidavit of Dave Anderson (Doc. # 17-2). The affidavit of Plaintiff Ruth Clough mirrors the complaint allegations, and contains the following specific

---

[7] This Court is somewhat puzzled by Plaintiffs' request for an order enjoining Defendants from using the membership list of the All States organization. During the hearing, this Court asked counsel for Plaintiffs whether Plaintiffs requested an order enjoining law enforcement from using the list in a criminal investigation, and counsel for Plaintiffs replied in the negative. This Court is uncertain about what other purposes the Defendants may have for the membership list in question. Counsel for Defendants aptly noted during the hearing that the only reason that the list was seized in the first place was as a part of an on-going state criminal investigation.

averments, among others: "While searching, officer Bishop asked
Bruce several times when we were going to march again." (Doc. # 3
at ¶ 12); Bruce asked what the officers were doing in his chicken
field, and "Officer Bishop replied that the officers were killing
all roosters that have their combs and spurs cut." (Doc. # 3 at ¶
13); "Law enforcement officers killed 314 roosters and let six
roosters out of pens who then fought with each other to near death.
All of the roosters that were left out of the pens later died."
(Doc. # 3 at ¶ 15); "[T]he American Poultry Association rules
require that show fowl be dubbed, which results in rapid
feathering, rapid growth, better identification, less fighting,
better livability, and better fertility." (Doc. # 3 at ¶ 17).

    In line with Ruth Clough's position, the affidavit of Dave
Anderson explains that he is the President of the American Poultry
Association "north America's oldest livestock organization" and he
is "knowledgeable about the requirements and standards associated
with showing poultry including game fowl." (Doc. # 17-2 at ¶ 2).
As to the issue of "dubbing" game fowl, a disputed issue in this
case, Dave Anderson avers, "The males (cocks) of certain breeds of
game fowl . . . must be dubbed (head appendages removed) in order
to be eligible for prizes in poultry shows.  This is similar to
docking tails or cropping ears of certain breeds of show dogs."
(Doc. # 17-2 at ¶ 3).  He adds, "The spurs of cocks are commonly
removed or blunted to protect people that handle the birds

11

(including judges) and to prevent injury to females during the mating process." (Doc. # 17-2 at ¶ 4).  Dave Anderson also provides, "Cock birds of any breed will fight with each other. They are territorial and will attack other males who enter their territory." (Doc. # 17-2 at ¶ 7).

In addition, Nicky Huggins, a feed delivery man who came to the Clough residence on the day in question to deliver feed, avers:

> I witnessed one animal control offer pull one of the roosters by his neck and his legs and stretch the rooster out while another animal control officer came and punctured the rooster in the chest.  At that point, the animal went limp and the officer handed it to a female animal control officer who set it in a box with other roosters. While doing this, the male Jacksonville police officer was laughing and appeared to say, "It looks like he's sticking his tongue out at me. This is one of the most inhumane things that I have ever witnessed in my life.  There were at least 4-5 boxes with roosters inside them that had been killed.

(Doc. # 17-3 at ¶¶ 6-9).

Defendants contest the majority of the factual allegations raised in Plaintiffs' First Amended Complaint and as described in Plaintiffs' supporting affidavits.  Notably, Defendants contend that the roosters in this case were professionally euthanized off the Clough residence at the Animal Control facility.  This is strikingly different from Plaintiffs' allegation that hundreds of roosters will killed inhumanely in the yard of the Clough residence.

In support of their position, Defendants filed the declaration of Officer Bishop (Doc. # 12-2), the declaration of Teresa A.

Terrell (Doc. # 12-3), the supplemental declaration of Officer Bishop (Doc. # 22-2), the declaration of Kimberly Niessen, Doctor of Veterinary Medicine (Doc. # 22-3), and the declaration of Detective Kevin L. Haines (Doc. # 22-4). Defendants paint quite a different portrait of the events in question than do Plaintiffs.

Officer Bishop declares that, "I approached the front door of the residence and knocked on the door, which was answered by Ruth Clough . . . Mrs. Clough invited us in, and thereafter, I read the search warrant to her and her husband . . . neither I nor any other officers burst through the door." (Doc. # 12-2 at ¶ 3). Officer Bishop further indicates, "We found a total of 314 'dubbed' roosters on the premises, which are illegal fighting animals under Florida law. The roosters were seized pursuant to the authority of the Warrant. Each 'dubbed' rooster was placed in an individual animal carrier brought for this purpose. After seizure, custody and control of the 'dubbed' roosters was transferred to the Officers of the Animal Control Division, for further handling and disposition." (Doc. # 12-2 at ¶ 5). Further, Officer Bishop declares, "No officer on the scene killed or euthanized any animal at the search site. All seized animals were removed from the premises live for disposition pursuant to Florida law by the Animal Control Division." (Doc. # 12-2 at ¶ 7(a)).

Officer Bishop also notes, "Mr. Clough had previously pled guilty to fighting and baiting animals in Duval County in 2001,

after an arrest that had occurred in the same location searched by me almost seven years later on January 15, 2008.  In 2001, police officers had observed Mr. Clough conducting a cockfighting event at these premises, with a large crowd present wagering on the outcome of the fights.  The police in 2001 made seizures of evidence on that occasion similar to that which I was making on January 15, 2008." (Doc. # 12-2 at ¶ 10).

In addition, Animal Control Officer Terrell states, "The 314 roosters were euthanized on the evening of January 15 and the morning of January 16 in a room at the Animal Care and Control shelter specifically designed for that purpose." (Doc. # 12-3 at ¶ 14). She further explains, "Each rooster was euthanized by a fully trained Animal Control officer in a humane and proficient manner, in accordance with Florida law, by injection with a solution designed to minimize any suffering.  I was present during the entire time of the euthanasia.  I personally euthanized approximately 100 dubbed roosters." (Doc. # 12-3 at ¶ 14).

Similarly, Kimberly Niessen, a veterinarian, adds, "In my professional opinion, it was not possible to humanely house and care for the dubbed roosters that were seized, and I agreed with the decision to euthanize the animals.  Because the animals seized were birds used for illegal fighting, it would have been inhumane to have them at the Clough premises, and they could not be adopted out or housed at Animal Control. Euthanasia was the only reasonable

and humane option available under the circumstances." (Doc. # 22-3 at ¶ 3).

With these warring affidavits and declarations comprising the bulk of the evidence on file, and taking into consideration the oral argument presented during the hearing held on July 2, 2008, the Court will now address the elements that Plaintiffs must demonstrate to be granted injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

**B.   Legal Standard**

A party seeking a preliminary injunction must demonstrate (1) a substantial likelihood of success the plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if interlocutory injunctive relief is not granted; (3) that the threatened injury to plaintiff outweighs any threatened harm an injunction may do to defendant; and (4) that granting a preliminary injunction will not dis-serve the public interest. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)(citing All Care Nursing Services Inc. v. Bethesda Memorial Hospital, Inc., 887 F.2d 1535, 1537 (11th Cir. 1990)).

The Eleventh Circuit recognizes that "'a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the "burden of persuasion' as to each of the four prerequisites." Seigel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)(citing McDonald's Corp. v. Robertson,

147 F.3d 1301, 1306 (11th Cir. 1998)).  In <u>Granny Goose Foods, Inc.</u>
<u>v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70</u>, 415
U.S. 423 (1974), the Court ruled that "Rule 65(b) does not place
upon the non-moving party the burden of coming forward and
presenting its case against a preliminary injunction." <u>Id.</u> at 442.
Thus, the burden falls squarely on the proponent of injunctive
relief.  Morever, the Eleventh Circuit also recognizes that the
grant of a preliminary injunction is "'the exception rather than
the rule, and plaintiff must clearly carry the burden of
persuasion.'"  <u>Id.</u> at 1180 (citing <u>United States v. Lambert</u>, 695
F.2d 536, 539 (11th Cir. 1983))(quoting <u>Texas v. Seatrain Int'l,</u>
<u>S.A.</u>, 518 F.2d 175, 179 (5th Cir. 1975)).

The Eleventh Circuit described the intricate balancing act
that this Court must perform in each case in which a preliminary
injunction is sought, as follows:

> It has been recognized, however, that if a court does not
> act until a trial on the merits of the cause of action,
> the party seeking relief might be irreparably harmed in
> the meantime.  Moreover, the judicial process can be
> rendered futile by a defendant's action or refusal to act
> during the pendency of the suit.  Thus, in order to
> protect a party from irreparable harm and to preserve the
> court's power to render a meaningful decision after a
> trial on the merits, a preliminary injunction can issue
> even though the right to permanent relief is still
> uncertain. However, in issuing such an order before the
> entire case has been fully and fairly heard, great care
> must be taken to assure that the power of a court to
> require or deter action does not result in unwarranted
> harm to the defendant or the public.

<u>Alabama v. United States Army Corps of Engineers</u>, 424 F.3d 1117,

1128 (11th Cir. 2005)(internal citations omitted).

The Court will now address these requirements, focusing on the requirement that Plaintiffs face irreparable injury absent injunctive relief, as this Court is most concerned with this element in this case.

### 1.   Threat of Irreparable Injury if Relief Denied

Plaintiffs must demonstrate that they will suffer irreparable injury absent an order granting the injunctive relief that they seek.  It is important to emphasize in this particular case, with hundreds of Plaintiffs' roosters euthanized by Defendants, that "a preliminary injunction is completely at odds with a sanction for past conduct that may be addressed by adequate remedies at law." United States Army Corps of Engineers, 424 F.3d at 1133. Further, as noted by the Supreme Court: "The sole function of an action for injunction is to forestall future violations.  It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured." United States v. Oregon State Medical Society, 343 U.S. 326, 333 (1952).

Thus, the present inquiry is whether Plaintiffs will suffer irreparable injury absent the requested injunction, not whether Plaintiffs have suffered an injury in the past.  As explained by the Eleventh Circuit, "because the purpose of a preliminary

17

injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, the harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits. Past harm . . . does not fall within this window, and therefore cannot serve as a basis for granting a preliminary injunction." <u>United States Army Corps of Engineers</u>, 424 F.3d at 1133-1134.

In Count One of Plaintiffs' First Amended Complaint, Plaintiffs allege that Defendants infringed their First Amendment liberties as to speech, specifically protest and petition. Plaintiffs assert that when the officers arrived at their home, commented on their protest marches, and then killed their roosters, their First Amendment right to protest and petition the government for redress of grievances was chilled. In Count Two of Plaintiffs' First Amended Complaint, Plaintiffs assert that seizure of the membership information of the All States organization constitutes a denial of the First Amendment right to freedom of association. Further, Plaintiffs assert that the seizure of the membership data "increases the likelihood of a substantial restraint upon members' exercise of their right to freedom of association." (Doc. # 26 at ¶ 34).

In Count three, Plaintiffs assert that the killing of the 314 roosters constituted a taking of property by the state without due

process of law or just compensation in violation of the Fourteenth Amendment.  In Count Four, Plaintiffs assert that the Defendants failed to comply with the Florida Statute on animal abuse: Florida Statute Section 828.122, et seq. During the hearing, counsel for Plaintiffs repeatedly asserted that Plaintiffs desire to dub their remaining roosters but have not done so due to fear that said roosters will be euthanized by Defendants.

### a. Freedom of Speech and Association

As to the threat of irreparable injury with respect to Plaintiffs' First Amendment allegations, this Court determines that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). However, not every violation of the First Amendment will entitle a movant to injunctive relief. As noted in Cate v. Oldham, 707 F.2d 1176 (11th Cir. 1983), "direct penalization, as opposed to incidental inhibition of First Amendment rights constitutes irreparable injury". Id. at 1188.  In this case, Plaintiffs assert that Defendants killed their roosters and seized their membership data in retaliation for Plaintiffs' decision to march in protest of the City's prior euthanasia of Danny Rowland's roosters.  Further, Plaintiffs assert that Defendants are interfering with Plaintiffs' First Amendment right to freedom of association.

19

In light of the constitutional rights at stake in this case, the Court must carefully evaluate Plaintiffs' request pertaining to the First Amendment (1) that the Defendants return the membership information for the All States organization to Plaintiffs, and (2) that Defendants refrain from using the membership information for the All States organization.[8]  A review of the <u>Younger</u> abstention doctrine is necessary to appropriately address Plaintiffs' requests concerning the membership list of the All States organization.

In <u>Younger v. Harris</u>, the Supreme Court held that federal courts generally may not enjoin pending state court criminal prosecutions: "[It] has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." <u>Younger</u>, 401 U.S. 37, 45 (1971). Thus, the <u>Younger</u> abstention doctrine mandates that a criminal proceeding should not be interfered with when the moving party already has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. <u>Id.</u> at 43. Indeed, "only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be

---

[8]  This Court will address later in this Order Plaintiffs' request for an injunction barring Defendants from killing any more of the Cloughs' birds without giving the Cloughs an opportunity to be heard.

accorded to the state criminal process." <u>Kugler v. Helfant</u>, 421 U.S. 117, 124 (1975).

As a threshold matter, for <u>Younger</u> abstention to apply, there must be an ongoing state criminal proceeding. <u>See</u> <u>Hicks v. Miranda</u>, 422 U.S. 332, 348-349 (1975). This element is satisfied in this case because Plaintiff Bruce Clough was arrested on cock-fighting related charges.[9]

Next, there are three recognized exceptions to the <u>Younger</u> abstention doctrine: (1) evidence of bad state proceedings motivated by bad faith, (2) irreparable injury, (3) lack of an adequate alternative state forum where the constitutional issues can be raised." <u>Hughes v. Attorney General of Florida</u>, 377 F.3d 1258, 1263 (11th Cir. 2004). In the instant case, the irreparable injury exception to <u>Younger</u> abstention must be considered. The Court in <u>Younger</u> held that to satisfy the irreparable injury exception, the injury must be "both great and immediate". <u>Id.</u>, at 46. The Eleventh Circuit has had the chance to discuss the irreparable injury exception to <u>Younger</u> on multiple occasions, and has consistently applied the <u>Younger</u> abstention doctrine in criminal cases. Further, the irreparable injury exception rarely precludes use of the doctrine. <u>But see</u> <u>Baggett v. Department of Professional Regulation, Board of Pilot Commissioners</u>, 717 F.2d

---

[9] However, this Court is mindful that Plaintiffs Ruth Clough and the All States organization are not parties to the state court proceedings.

521, 523-524 (11th Cir. 1983) (holding that <u>Younger</u> abstention did not apply because national interests in maritime issues outweighed state issues).  In this case, because two of the Plaintiffs are not parties to the criminal state court case, it would be improper to utilize the <u>Younger</u> abstention doctrine to deny the requested injunctive relief.

It may well be the case that Plaintiffs are entitled to some sort of injunctive relief in this case with respect to their First Amendment claims.  The Court notes that Plaintiffs initially requested an injunction "enjoining the Defendants, their agents, servants, employees, attorneys, and all person in active and concert participation from further infringing on Plaintiffs' first amendment rights [and] violating Plaintiffs' First Amendment Right to associate."  While overly vague for Rule 65 purposes, this request for relief could have been tailored to meet the requirements of Rule 65 in this case.  However, Plaintiffs stripped down their request for injunctive relief and have requested injunctive relief that would invade the province of the state court.  Specifically, Plaintiffs request that the membership information for the All States organization be returned to Plaintiffs.  Plaintiffs request this information because, without it, they assert that they do not know the names and addresses of the members of the All States organization.

The problem with Plaintiffs' request is that the membership list was seized by Defendants in the course of a pending criminal investigation, and the membership list is presumably a piece of evidence in a pending criminal case in state court.  Plaintiffs should first petition the state court for the list before asking this Court to interfere with the pending state court prosecution of Bruce Clough or any other criminal proceeding. This ruling is not predicated on <u>Younger</u>, rather it is based upon a similar foundation of respect for the state court judicial system.

Plaintiffs' second request for injunctive relief is equally inappropriate.  Plaintiffs seek an order enjoining Defendants from using the membership list of the All States organization. Plaintiffs' counsel submitted during the hearing on this matter that Plaintiffs did not seek an order barring the use of the membership list in a criminal investigation.  However, as Defendants include law enforcement officers, it seems to this Court that the requested relief rings hollow and serves no purpose other than to confuse the issues in this case.  This Court will not grant an injunction that is futile to the beholder of such injunction and impossible to enforce as to the party against whom such injunction is issued.

Accordingly, the Court denies Plaintiffs' request for an injunction regarding the All States membership list. This Court will now discuss Plaintiffs' request for an injunction prohibiting

Defendants from killing any more of the Cloughs' birds without giving the Cloughs an opportunity to be heard.

### b.  <u>Due Process</u>

Generally, Plaintiffs are entitled to procedural due process of law in the taking of their private property by the State: "some kind of hearing is required at some time before a person is finally deprived of his property interests." <u>Wolff v. McDonnell</u>, 418 U.S. 539, 557 (1974).  As declared in <u>North Georgia Finishing v. Di-Chem, Inc.</u>, 419 U.S. 601 (1975), "[A]ny significant taking of property by the State is within the purview of the Due Process Clause." <u>Id.</u> at 606 (citing <u>Fuentes v. Shevin</u>, 407 U.S. 67, 86 (1972)).[10]  Animals, such as Plaintiffs' roosters, are private property for the purpose of due process analysis. <u>See</u>, <u>e.g.</u>, <u>Koop v. United States</u>, 296 F.2d 53, 59 (8th Cir. 1961)("There is no property in wild animals until they have been subjected to the control of man.  If one secures and tames them, they are his property; if he does not tame them, they are still his, so long as they are kept confined and under his control.")(citations omitted);

---

[10] The Court in <u>Fuentes</u> made clear that seizure of private property without notice and an opportunity to be heard can only occur in unusual circumstances with the following three requirements having been met: "First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest.  Second, there has been a special need for very prompt action.  Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a governmental official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." <u>Id.</u>

County of Pasco v. Reihl, 635 So. 2d 17 (Fla. 1994)(Applying the protections of the Due Process Clause of the Fourteenth Amendment to dogs, and noting, "An animal becomes private property when it is under the 'private control, confinement, and possession of an owner.'")(citing Barrow v. Holland, 125 So. 2d 749, 751 (Fla. 1960)).[11]

The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. Matthews v. Elridge, 424 U.S. 319, 333 (1976)(citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).[12]   In the present case, although

---

[11] Notably, the Court in Riehl struck down a Florida Statute which allowed dogs to be classified as "dangerous" without a hearing.  The Court found that a pre-deprivation hearing had to take place before a dog could be declared dangerous under the statute, and because Section 767.12 did not provide for such a hearing, the statute was unconstitutional.  Interesting, the statute did not call for the dangerous dogs to be euthanized, it called, instead, for such dogs to be confined, identified by tattoo or implantation, and muzzled.  The Court held: "The Due Process Clause of the Fourteenth Amendment requires that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.  In the instant case, the Riehl's private property was subject to, among other things, physical confinement, tattooing, or electric implantation, and muzzling.  In the aggregate, these restrictions are a deprivation of property and before such restrictions are imposed the property owner must be afforded the opportunity to be heard. Accordingly, we find that the Riehls suffered a deprivation of property without benefit of a hearing, and such deprivation was a violation of their procedural due process rights." Id. at 18-19.

[12] Unrelated to animal fighting, the case of James v. City of St. Petersburg, 6 F.3d 1457 (1993), demonstrates the breadth of Due Process requirements.  In James, the Eleventh Circuit held that users of water services had a Due Process right to notice before termination of such water services, even when the termination of water services was predicated on non-payment for such services. Id.

the facts surrounding where and how the roosters were killed remain disputed, it is not disputed that the dubbed roosters were permanently destroyed without giving the Cloughs notice and an opportunity to be heard.

### i.  **Dubbing Roosters**

It is necessary to delve into the matter of "dubbing" at this point. The practice of "dubing" roosters involves removing the rooster's combs and waddles with a sharp instrument.  This Court has spent considerable time researching the practice and determines that the practice likely has its roots in cockfighting, but that individuals who are not engaged in illegal cockfighting, such as individuals who show their birds in poultry shows, may employ dubbing for proper purposes.  Plaintiffs' exhibit entitled "Dubbing Poultry, why and how to do it" contains the following explanation, which has not been refuted by Defendants:

> Some people say it's cruel; others say they wouldn't do it because it spoils the look of the birds; still others, and the number is growing, say they wouldn't go through a winter without its benefits.  The reference is to dubbing, or removal of the combs and wattles from the breeding cockerels.  From actual experience, I know that the birds will suffer far less from dubbing than from freezing, will eat more freely and therefore keep in better condition when the wattles are removed, and will not get hurt in a fight that otherwise might result in serious flow of blood and loss of vigor. I recommend every poultryman to dub all of his cockerels.  The operation is not difficult and the birds fully recover in two weeks.

at 1463.

(Doc. # 3-2 at 7).

Dave Anderson, President of the American Poultry Association, indicates: "The males (cocks) of certain breeds of game fowl . . . must be dubbed (head appendages removed) in order to be eligible for prizes in poultry shows.  This is similar to docking tails or cropping ears of certain breeds of show dogs." (Doc. # 17-2 at ¶ 3).  In addition, Ruth Clough's affidavit indicates that dubbing "results in rapid feathering, rapid growth, better identification, less fighting, better livability, and better fertility." (Doc. # 3 at 5).  This Court has not been provided with enough information to determine whether Plaintiffs dubbed their roosters for improper purposes.

Two animal fighting statutes are relevant to the outcome of this case: the Florida Animal Fighting Act, Florida Statute Section 828.122, and the Animal Welfare Act, 7 U.S.C. 2156.   Neither statute specifically bars dubbing roosters.  Defendants repeatedly assert that the only use for dubbed roosters is illegal animal fighting, but Defendants' bare assertions are wholly unsupported by existing law.  Defendants admit in their pleadings that dubbing roosters is not "per se" illegal. (Doc. # 22 at 4).

Nevertheless, Defendants contend that they complied with Animal Fighting Act.  As will be discussed below, there is a serious debate about whether Defendants should have provided Plaintiffs with notice and an opportunity to be heard under Florida

27

law before euthanizing their roosters in this case.

## ii. Florida's Animal Fighting Act

Section 828.122(3)(a) of the Animal Fighting Act proscribes "possessing or using any wild or domestic animal for the purpose of animal fighting or baiting." As a caveat, however, the Act states, "Notwithstanding any provision of this subsection to the contrary, possession of the animal alone does not constitute a violation of this section." Fla. Stat. Section 828.122(3). The Animal Fighting Act provides guidance for law enforcement and other state actors faced with animal fighting.

Subsection four of the Animal Fighting Act states, "If a court finds probable cause to believes that a violation of this section of section 828.12 has occurred, the court shall order the seizure of any animals and equipment used in committing the violation and shall provide for appropriate and humane care or disposition of the animals. This subsection is not a limitation on the power to seize animals as evidence at the time of arrest." Fla. Stat. Section 828.122(4).

Subsection five of the Act thereafter provides, "If an animal shelter or other location is unavailable, a court may order the animal to be impounded on the property of its owner or possessor and shall order such person to provide all necessary care for the animal and to allow regular inspections of the animal by a person designated by the court." Fla. Stat. Section 818.122(5).

28

Subsection six of the Act states in pertinent part: "If a veterinarian finds that an animal kept or used in violation of this section is suffering from an injury or a disease severe enough that it is not possible to humanely house and care for the animal pending completion of a hearing held under Section 828.073(2), final disposition of the criminal charges, or court-ordered forfeiture, the veterinarian may euthanize the animal as specified in section 828.058.[13] A veterinarian licenced to practice in this state shall be held harmless from criminal or civil liability for any decisions made or services rendered under this subsection." Fla. Stat. Section 828.122(6).

Subsection seven provides, "if an animal can be housed in a humane manner, the provisions of Section 828.073 shall apply.[14] For the purpose of a hearing provided pursuant to Section 828.073(2), any animal baited, bred, trained, transported, sold, owned,

---

[13] Florida Statute Section 858.058, entitled "Euthanasia of dogs and cats," provides standards and proper procedures for the humane euthanasia of cats and dogs, including a list of the substances which can be utilized to cause the death of the animals to be euthanized.

[14] Florida Statute Section 828.073 sets forth detailed notice and hearing requirements applicable to the owners of "mistreated" animals. The statute provides for "a hearing, to be set within 30 days after the date of seizure of the animal or issuance of the order to provide care and held not more than 15 days after the setting of such date, to determine whether the owner, if known, is able to provide adequately for the animal and is fit to have custody of the animal. The hearing shall be concluded and the court order entered thereon within 60 days after the date the hearing is commenced." Fla. Stat. Section 828.073(2)(B).

possessed, or used for the purpose of animal fighting or baiting shall be considered mistreated." Fla. Stat. Section 818.122(7).

Defendants rely on subsection six of the Act, and contend that the Cloughs' 314 dubbed roosters were used as fighting birds in violation of the Animal Fighting Act.  Further, Defendants argue that the roosters, on account of being dubbed, were suffering from an injury or a disease so severe as to render humane housing and care of the roosters impossible.  Thus, Defendants argue that it was proper to euthanize the dubbed roosters and that a hearing pursuant to Florida Statute Section 828.073, prior to the mass euthanasia of the 314 roosters, was not required.

Plaintiffs, on the other hand, assert that the roosters could have remained impounded on the premises with a mandate that the animals not be used for fighting and with proper supervision by animal control officers or others as provided by subsection five of the Act.  Plaintiffs also argue that the roosters were not injured or diseased.

At this stage in the proceedings, this Court cannot determine whether Defendants violated the procedural requirements of the Animal Fighting Act or the Due Process Clause of the Fourteenth Amendment.  For such a determination to be made, the trier of fact will require evidence concerning the state of the roosters at the time of seizure, including their health, any injuries that they may have had, and their demeanor, as well as other testimony.

30

During the hearing, this Court inquired of counsel for Defendants whether, other than being "dubbed," the roosters were injured or showed signs that they had been fighting, and counsel for Defendants replied that he had heard that the birds were injured. This statement cannot serve as the only justification for the immediate destruction of hundreds of animals.  Furthermore, it is common knowledge that roosters will fight with each other without human training or provocation. This fact was recognized by the Florida Supreme Court in the historical case of <u>Mikell v. Henderson</u>, 63 So.2d 508 (1953), a case challenging a prior version of Florida's Animal Fighting Act, in which the Court noted, "Everyone familiar with roosters, and particularly game roosters, know that they need no encouragement to fight.  It is not necessary that their tail feathers be pulled, or that any other inducement be offered, or stimulant applied, in order to produce a fight." <u>Id.</u> at 508.

Were this Court presented with solid evidence that the subject roosters were afflicted with obvious injuries other than being "dubbed," (injuries beyond that attributable to natural barnyard fights as described in the <u>Mikell</u> case), perhaps this Court could now rule that immediate destruction of the roosters, without notice and a hearing, was needed.  However, with the scant, unreliable, and inconclusive evidence thus far presented, this

Court cannot enter a definitive ruling.[15]

In an abundance of caution, this Court decrees that Defendants cannot kill any more of Plaintiffs' birds without giving the Cloughs an opportunity to be heard.  Should Defendants meet the statutory requirements justifying euthanasia of the Cloughs' remaining roosters in appropriate state proceedings, this Court will not stand in the way of such proceedings.  This Court only requires that the Cloughs be afforded notice and an opportunity to be heard, as contemplated in Florida Statute Section 828.073, before the permanent destruction of their birds, which constitute personal property, can take place.  Until this case is decided on the merits, Plaintiffs may "dub" their roosters, as permitted by

---

[15] This Court has reviewed the Declaration of Officer Terrell on numerous occasions.  She describes in detail how the Cloughs' dogs were in dire straights.  She reports, "On the premises there were numerous older dogs in visibly poor health (matted hair, loss of hair, undernourished), exhibiting aggressive behavior, without collars or tags, barking and running around in a fenced area, as well as hundreds of unrestrained chickens and pigeons and hundreds of caged roosters." She issued an animal cruelty citation to the Cloughs for "a male Great Pyrenees dog chained with swivel hooks next to one of the rooster coops that could not reach its dog house." (Doc. # 12-3 at ¶ 7).  The state of the Cloughs' dogs is not relevant to the instant matter.  However, because Plaintiffs challenge the euthanasia of their roosters, one would imagine that Officer Terrell's affidavit would similarly detail any injuries that the roosters had sustained.  Instead, as to the roosters, Officer Terrell indicates that the roosters were housed in separate cages and were given "stagnant rain water" to drink. (Doc. # 12-3 at ¶ 8). She further states, "The 315 roosters seized from the Clough premises suffered from severe injuries due to their combs and waddles having been cut off, and their spurs trimmed." (Doc. # 12-3).  The absence of allegations that the roosters were injured or damaged (other than being dubbed and having stale water to drink) is quite telling.

law, without fear of immediate euthanasia by Defendants.

## 2. Other Rule 65 Factors

This injunction is supported by this Court's finding that Plaintiffs may be likely to succeed on the merits of their Due Process claim.  Further, the Court finds that Plaintiffs face a threat of irreparable injury as to the roosters that they plan to dub because Defendants indicated at the hearing that the dubbing of a rooster is the first step toward probable cause in an animal fighting case.

Next, this Court determines that the balance of the equities militates in favor of Plaintiffs because once a rooster is euthanized, the cock can crow no more.  Plaintiffs should not have to suffer additional decimation of their private property during the pendancy of this suit.  Last, the public interest will be served by allowing the Cloughs notice and an opportunity to be heard before the destruction of their private property.  As stated by Plaintiffs in the motion for Preliminary Injunction, "The public interest in maintaining . . . due process is considerable and has been clearly established. To deny the injunction would allow the Defendants to violate Plaintiffs' basic freedoms enjoyed under the Constitution.  The public interest is best served by enjoining the Defendants' actions until the Court has determined their constitutionality." (Doc. # 2 at 11-12).  As such, Plaintiffs have met their burden to be granted injunctive relief as to the

destruction of their remaining birds.

**V.**   **Bond**

Federal Rule 65(c) states that "the court may issue a preliminary injunction or a TRO only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Plaintiffs request that bond be waived, and Defendants have made no mention on bond thus far in these proceedings.

This Court has the discretion to waive bond, see Johnston v. Tampa Sports Authority, 8:05-cv-2191, 2006 U.S. Dist. LEXIS 77614 (M.D. Fla. Oct. 16, 2006), where the court held that "the bond requirement of Rule 65(c) is appropriately waived in certain circumstances," involving fundamental or constitutional rights. In determining whether to waive bond, the court should consider: (1) the possible loss to the enjoined party, (2) the hardship that a bound would impose upon the applicant, and (3) the impact of a bond on the enforcement of federal rights.

Plaintiffs bring a constitutional law complaint and allege infringement of fundamental rights. The action that they fear, permanent destruction of their roosters, is a considerable loss to face. The Court finds it appropriate to waive the bond requirement in this case.

## VI.   <u>Conclusion</u>

This Court's highest calling is to safeguard the fundamental liberties guaranteed by the United States Constitution, including the basic requirement that individuals be granted notice and an opportunity to be heard prior to permanent destruction of their personal property by state action.  This unflagging duty sometimes requires the Court to grant relief to individuals who, in the Court's eyes, may be engaged in illegal, immoral, or disturbing activities.  Bruce Clough has been charged with violation of the Animal Fighting Act and presumably awaits trial in state court. This is the second time that formal charges have been brought against him for the mistreatment of his animals.  This Court is no champion of Bruce Clough or his organization.  Rather, this Court is a champion of the Constitution and the individual liberty interests endowed to each member of our great nation.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Plaintiffs' Motion for Preliminary Injunction (Doc. # 2) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

    (a)   Plaintiffs' request for an injunction barring the Defendants from killing any more of the Clough's birds without giving the Cloughs an opportunity to be heard is **GRANTED;**

    (b)   Plaintiffs' request for an injunction barring the

Defendants from using the seized membership list from the All States organization is **DENIED**; and

(c) Plaintiffs' request for an injunction compelling the Defendants to return the membership list of the All States organization to Plaintiffs is **DENIED**.

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 29th day of July 2008.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies to:

All Parties of Record